## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In the Matter of | ) | No. 10 M 275 |
| the EXTRADITION of | ) | |
| SARUNAS PABERALIUS | ) | Magistrate Judge Nan R. Nolan |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The United States, on behalf of the Republic of Lithuania, seeks the extradition of Sarunas Paberalius, a citizen of Lithuania: (1) to serve a three-year sentence for violating the terms of his supervised release, following his conviction for violating traffic laws causing death of a person; and (2) to face charges in Lithuania for disturbing the peace. After carefully reviewing and considering the documents and materials submitted by the Government and after considering the evidence introduced by Paberalius and the Government at the hearing on this matter, as well as the oral and written arguments by counsel, the Court finds that the Government's evidence falls short of establishing that the crimes for which extradition is requested are covered by the Treaty or establishing probable cause to believe that Paberalius committed the crimes.

## I. LEGAL STANDARD

Extradition is a diplomatic process governed by the provisions of the federal extradition statute, 18 U.S.C. § 3181 *et seq.*, and by the relevant treaty—in this case,

the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Lithuania, Oct. 23, 2001, U.S.-Lithuania, S. Treaty Doc. 107-4 (entered into force March 31, 2003) ("Treaty"). Both the statute and the Treaty require the country seeking extradition—in this case, Lithuania—to submit a request through proper diplomatic channels. 18 U.S.C. § 3184; Treaty art. 8, ¶ 1. The request must "be supported by sufficient evidence to show that the individual is the person sought for the crimes charged, that the crimes are among those listed as extraditable offenses in the Treaty and that there is sufficient justification for the individual's arrest had the charged crime been committed in the United States." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1931); *accord In re Extradition of Mazur*, 2007 WL 2122401, at *1 (N.D. Ill. July 20, 2007). Specifically, the Treaty requires Lithuania to submit: documents, statements, or other types of information which describe the identity, nationality, and probable location of the person sought; information describing the facts of the offense and the procedural history of the case; the relevant text of the provisions of law describing the essential elements of the offense for which extradition is requested; the relevant text of the provisions of law prescribing punishment for the offense; a statement of the provisions of law describing any time limit on the prosecution; a copy of the warrant or order of arrest issued by a judge, court or other competent authority; a copy of the charging document; and such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought. Treaty art. 8, ¶¶ 2–3. If the State Department approves the request, the papers are then for-

warded to the U.S. Attorney's office in the district where the person sought may be found; the U.S. Attorney may then file a complaint and seek an arrest warrant from a magistrate judge. *Eain*, 641 F.2d at 508. If a warrant issues, the magistrate judge then conducts a hearing to determine whether there is sufficient evidence to sustain the charge under the provisions of the treaty. *Id.*

The authority of a magistrate judge serving as an extradition judicial officer "is limited to determining an individual's eligibility to be extradited, which is done by ascertaining (1) whether the crime is an extraditable offense under the subject treaty and (2) whether probable cause exists to sustain the charge." *United States v. Nolan*, 651 F. Supp. 2d 784, 790 (N.D. Ill. 2009) (citation omitted); *see In re Mazur*, 2007 WL 2122401, at * 1 ("An extradition court exercises very limited authority in the overall process of extradition . . . ."); *see also* 18 U.S.C. § 3184 (providing for extradition "if, on such hearing, [the court] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention"). Thus, a request for extradition will be granted where: (1) the judicial officer has jurisdiction to conduct an extradition proceeding, (2) the court has jurisdiction over the fugitive, (3) the person before the court is the fugitive named in the request for extradition, (4) there is an extradition treaty in full force and effect, (5) the crimes for which surrender is requested are covered by that treaty, and (6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought. *In re Extradition of Garcia*, 188 F. Supp. 2d 921, 925 (N.D. Ill. 2002) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *accord Nolan*, 651 F. Supp.

2d at 790. "If the magistrate judge determines that the offenses charged are within the treaty's terms and probable cause exists, he is to certify the matter to the Secretary of State, who has sole discretion to determine if the extradition should proceed." *Nolan*, 651 F. Supp. 2d at 790; *see In re Mazur*, 2007 WL 2122401, at *1. On the other hand, "should the magistrate determine that the offense charged is not within a treaty's terms or find an absence of probable cause, the magistrate cannot certify the matter to the Secretary of State for extradition." *Eain*, 641 F.2d at 508.

The hearing contemplated under the extradition statute is not a trial on the merits of the charges, but is more in the nature of a preliminary hearing. *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993). "At an extradition hearing, the defendant's right to challenge the evidence introduced against him is quite limited. He can offer evidence that explains the requesting country's proof, but he cannot submit evidence that contradicts it." *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 884 (N.D. Ill. 2006). "To be sure, an extradition proceeding is a strange bird: it is not a criminal proceeding, though it involves criminal conduct; and, although it is a federal court hearing, neither the federal rules of criminal procedure, nor the federal rules of evidence applies. An extraditee is not permitted to present a 'defense' in the sense that we typically apply that term; he may rebut probable cause and he may explain the evidence offered by the extraditing country. Evidence that 'explains away or completely obliterates probable cause' is admissible; evidence that 'merely controverts the existence of probable cause' is not." *In re Mazur*, 2007 WL 839982, at *3. "The distinction between 'contradictory evidence' and 'explanatory evidence' is

difficult to articulate. However, the purpose behind the rule is reasonably clear. In admitting 'explanatory evidence,' the intention is to afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause. The scope of this evidence is restricted to what is appropriate to an extradition hearing. The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits." *In re Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978); *see Lindstrom v. Gilkey*, 1999 WL 342320, at *5 (N.D. Ill. 1999) ("The court must seek to distinguish between 'contradictory,' which is not admissible, and 'explanatory' evidence, which is admissible"); *In re Guillen*, 1991 WL 149623, at *8 (N.D. Ill. 1991) ("The accused in an extradition hearing is not entitled to contradict the demanding country's proof or pose questions of credibility, but is limited to offering evidence which explains or clarifies that proof."). Nevertheless, the scope of evidence admitted is left to the sound discretion of the court, guided by the distinction between "contradictory" and "explanatory" evidence. *Charlton v. Kelly*, 229 U.S. 447, 456 (1913); *accord Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978).

## II. BACKGROUND

### A. Procedural History

On July 22, 2010, the United States filed a complaint seeking the provisional arrest and extradition of Sarunas Paberalius, and a warrant for his arrest was issued.

Paberalius was arrested on August 2, 2010. Since that time, he has been detained at the Metropolitan Correctional Center, pursuant to Article 11 of the Treaty.

The United States, acting on behalf of the Republic of Lithuania, filed a formal request for extradition on August 2, 2010. The filing included various documents submitted by Lithuania in accordance with the Treaty. On December 20, 2010, the Government filed an amended complaint, charging Paberalius with two extraditable offenses:

> Paberalius was convicted of violating Paragraph 4 of Article 246 of the Criminal Code of the Republic of Lithuania (violation of the Road Traffic Regulations or rules of exploitation of the means of transport causing death of a person) on December 22, 1999 and sentenced to imprisonment for a term of three years by the District Court of the Region of Kėdainiai. . . . The court, however, suspended the sentence for a two-year period on the following conditions: (1) Paberalius was prohibited from changing his place of residence without notice; and (2) Paberalius was required to pay compensation for the damage caused by the crime by December 31, 2000. According [to] Lithuanian authorities, Paberalius failed to comply with these conditions, in particular, Paberalius changed his place of residence without notice and hid. Therefore, on March 22, 2001, the District Court of the Region of Kėdainiai directed Paberalius to serve the custodial sentence.

> \*   \*   \*

> On September 21, 1999, the Police Commissariat of Kėdainiai Region instituted a criminal case against Paberalius under Paragraph 2 of Article 225 of the Criminal Code of the Republic of Lithuania (Hooliganism). Subsequently, on February 4, 2010, the District Prosecutor of the Kėdainiai Region entered a decision recognizing Paberalius as a suspected violator of Paragraph 1 of Article 284 of the Criminal Code of the Republic of Lithuania (Violation of Public Order) and, on March 2, 2010, the District Court of the Region of Kėdainiai imposed a measure of constraint/arrest on Paberalius.

(Am. Compl. ¶¶ 5, 8.) On January 18, 2011, the Government, on behalf of Lithuania, filed additional documents in support of its request for extradition.

Paberalius opposes the Government's request for extradition, filing a Memorandum of Fact and Law Contesting Extradition on March 21, 2011 ("Opp'n"). On April 4, 2011, the Government filed a Memorandum in Support of Extradition ("Reply").

The Court conducted a hearing on May 12, 2011. The exhibits attached to the Government's Reply (Exs. A–G) were admitted without objection. In addition, the Government submitted four documents from the Secretary of State's website (Exs. H–K), which were admitted without objection. The exhibits attached to Paberalius's Opp'n were admitted over the Government's continuing objection as to the scope of the hearing.[1] Paberalius also submitted four letters in support of his opposition to the extradition request, which were admitted without objection.

## B. Evidence Before the Court

### 1. Background

Sarunas Paberalius is a native and citizen of Vilnius, Lithuania. (Paberalius Aff. ¶ 1; Hr'g Tr. 19.)[2] In July 1991, he began working for the Lithuanian Interior System as a Criminal Law Officer and in various other elite police subdivisions. (Id. ¶ 2.) He later applied to work for the Lithuanian Secret Service but was not accepted. (Hr'g Tr. 21.)

In August 1997, Paberalius began working for the Agency of Sovereign Counselors (initials "NPA"), a private security firm which protected affiliates, managers,

---

[1] The Government objected to evidence presented by Paberalius at the hearing to the extent that it was beyond the scope of the hearing contemplated by the extradition statute. (Hr'g Tr. 24; see id. 5–7.) The Court allowed the evidence for background purposes only. (Id. 24–25.)

[2] Paberalius's affidavit is attached to the Opp'n.

employees, and guests of Vikonda, a large Lithuanian company owned by Victor Uspaskich, a Russian-born person with alleged ties to the Russian KGB. (Paberalius Aff. ¶¶ 4, 6.) Uspaskich was also employed by the Russian company Gasprom, one of the largest oil companies in the world. (*Id.* ¶ 4.) Paberalius's primary duty was providing security for Uspaskich. (*Id.* ¶ 6.) Because the Lithuanian government was interested in learning more about the activities of Uspaskich and his company, Paberalius was asked by the Lithuanian Secret Service to work undercover for the Lithuanian government while maintaining close contact with Vikonda through the NPA. (*Id.* ¶ 4.) As he was interested in obtaining permanent employment with the Secret Service, Paberalius accepted the opportunity. (*Id.* ¶ 5.)

By February 1998, Paberalius began to suspect that his undercover work on behalf of the Secret Service had been compromised. (Paberalius Aff. ¶ 6.) On two separate occasions, Paberalius was physically attacked by a group of men. (*Id.* ¶¶ 7–8.) On both occasions the attackers were arrested, but the authorities declined to prosecute. (*Id.*) On the night of October 22, 1999, a warhead grenade was thrown into the bedroom window of Paberalius's apartment in Kėdainiai. (*Id.* ¶ 9.) The grenade exploded in his bedroom causing massive damage, but Paberalius was not in the room at the time of the explosion. (*Id.*) Shortly thereafter, Uspaskich ordered the Director of the NPA to transfer Paberalius back to Vilnius or fire him. (*Id.* ¶ 11.) Before he was transferred, Paberalius maintains that two false charges were brought against him. (*Id.* ¶ 12.) These two charges form the basis of the extradition request in this case.

Given the violent attacks against him, the failure of police to pursue those cases, and the trumped up charges against him, Paberalius believed that his safety was in serious peril. (Paberalius Aff. ¶ 13.) Through his work with the Lithuanian government he personally knew Vytautas Landsbergis, who was the first president of the Lithuanian Republic. (*Id.*) Landsbergis utilized his influence to get Paberalius an American visa in one day. (*Id.*) Paberalius left for the United States in December 2000 where he has resided since. (*Id.*; *see* Hr'g Tr. 33–34.) During his time in the United States, Paberalius has worked and paid taxes. (Hr'g Tr. 34.)

Paberalius has applied for asylum in the United States. (*See* Hr'g Tr. 35.) Under extradition law, however, this Court cannot consider the adverse treatment that could await Paberalius if he were extradited to Lithuania. *In re Mazur*, 2007 WL 839982, at *3 (rule of noninquiry precludes extradition court from considering the procedures or treatment that await the relator in requesting state); *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997) ("More than just a principle of treaty construction, the rule of non-inquiry tightly limits the appropriate scope of judicial analysis in an extradition proceeding. Under the rule of non-inquiry, courts refrain from investigating the fairness of a requesting nation's justice system and from inquiring into the procedures or treatment which await a surrendered fugitive in the requesting country.") (citation omitted). Instead, "it is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds." *Ahmad v. Wigen*, 910 F.2d 1063, 1067 (2d Cir. 1990); *see Masopust v. Fitzgerald*, 2010 WL 324378, at *2 (W.D. Pa. Jan. 21, 2010) ("In extradition proceed-

ings, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender. The Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations-factors that may be beyond the scope of the magistrate judge's review.") (citation omitted); *Kin-Hong*, 110 F.3d at 111 ("It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed.")

## 2. *Traffic Violation*

On March 19, 1998, Paberalius was driving an NPA vehicle in Vilnius, Lithuania, providing security while the security guards in the car in front of his collected cash from various supermarkets. (Hr'g Tr. 37–38.) When the two vehicles arrived at a supermarket, Paberalius and the other NPA employee in his vehicle were the first ones to step out and make sure the area was secure. (*Id.* 59.)

By 6:00 to 7:00 in the evening, Paberalius had been on duty for approximately 24 hours. (Hr'g Tr. 58.) Although it was dark out, the weather was clear. (*Id.* 38–39.) While Paberalius was driving on J. Basanavičius Street at approximately 40 km/h (25 mph), a car suddenly pulled out from Tiltas Street, crossing Paberalius's travel path and causing him to slow down. (*Id.* 38–40; Reply Ex. F ("Judgment")[3] at 1, 2, 4, 6, 7.) Paberalius traveled through the intersection in the center lane, which was

---

[3] The Judgment was issued on December 22, 1999 by a Lithuanian court after hearing testimony and reviewing evidence.

designated for left turns only, moved into the right lane, and stopped abruptly.[4] (Judgment 1–3.) In so doing, Paberalius blocked the path of a bus, which was driving at approximately 30–35 km/h (19–22 mph). (*Id.*) To avoid a collision, the bus driver braked suddenly and turned toward the curb before coming to a stop. (*Id.* 1, 3.) As a result, a passenger in the bus, who had gotten out of his seat to punch his ticket, fell down, injuring his back.[5] (*Id.* 1–2.)

At the time of the incident, Paberalius was unaware of any injuries on the bus. (Hr'g Tr. 44.) Over an hour later, the police asked him to return to the scene to take a statement, but he was not issued a traffic ticket or otherwise cited. (*Id.* 43–44.)

Over 14 months later, on June 7, 1999, the bus passenger died. (Judgment 1–2; *see* Reply Ex. E.) Doctors opined that the bus passenger's death was the result of an inflammation which started when his spinal cord was injured in the fall. (Judgment 2, 5.) Paberalius was charged with violating several traffic regulations resulting in death. (*Id.* 1.) After reviewing the evidence, the trial court found that Paberalius's car "approached the intersection driving in the second lane which only allowed traffic going left. The car could not change lanes safety and move into the first lane without making an obstacle for the bus . . . and without making a dangerous situation on the road." (*Id.* 5–6.) The court concluded that Paberalius had violated sev-

---

[4] Paberalius and the other NPA employee in Paberalius's vehicle testified that Paberalius was driving in the right lane and braked to avoid hitting the car that cut them off but did not come to a stop. (Hr'g Tr. 40–42; Judgment 4.) The Lithuanian court discounted this evidence, noting that Paberalius and his passenger were biased and had given different versions on the day of the incident. (Judgment 4, 7.)

[5] One of the passengers on the bus testified, however, that the bus braked but did not stop. (Judgment 3.) "Only when she and other passengers started shouting 'a man was injured' the bus stopped." (*Id.*)

eral traffic regulations by not keeping a "safe cushion" when he stopped abruptly after changing into the right lane. (Judgment 1.) Paberalius was convicted of violating paragraph 4 of article 246 of the Criminal Code of the Republic of Lithuania, which provides that:

> A person who drives a means of transport and violates the Road Traffic Regulations or rules of exploitation of the means of transport and as a consequence causes death of one or more persons shall be bound to imprisonment from one to ten years with revoking the right to perform certain responsibilities or certain actions.

(Reply Ex. E at 2.)

The Lithuanian court sentenced Paberalius to three years of imprisonment and revoked his driver's license. (Judgment 8.) Nevertheless, the court took into account that Paberalius had no prior record and "the crime was not intentional." (*Id.*). Consequently, the court suspended his sentence for a two-year period on the conditions that he (1) not change his place of residence without notifying the authorities and (2) make restitution to the victim's spouse. (*Id.*)

In March 2001, the Lithuanian court determined that Paberalius had violated the terms of his supervised release. (Reply Ex. E at 1; Am. Compl. Ex. C. at 1) Specifically, the court found that Paberalius "changed his place of residence without any notice to the authorities responsible for the suspension of the sentence and hid," and did not make restitution. (*Id.*) Accordingly, the court revoked Paberalius's supervised release and sentenced him "to serve the imposed penalty of imprisonment for three years." (Am. Compl. Ex. C. at 2; *see* Reply Ex. E at 1.)

### 3. *Disturbing the Peace*

On September 11, 1999, Paberalius was working for NPA as the head of a security detail for a private party being held at a café in Kėdainiai. (Reply Ex. G ("Battery Summary") at 1; Hr'g Tr. 47.) He and two other security guards—Robertas Taranda and Vaidotas Kačegavičius—are accused of beating two party guests. (Battery Summary 1.)

On December 21, 1999, Paberalius was interviewed regarding the incident. (Battery Summary 1.) He stated that on September 11, 1999, he was approached by someone who identified two persons in the café as suspects in an earlier battery. (*Id.*). Paberalius and his colleagues apprehended the suspects, placed them in handcuffs and transferred them to police officers. (*Id.*; *see* Hr'g Tr. 47–48, 65.) Although the suspects resisted and struck one of Paberalius's colleagues in the face, they were not beaten.[6] (*Id.*)

The suspects testified otherwise.[7] (Battery Summary 1–2.) They each stated that Taranda took them from the café to a nearby warehouse where all three security guards, including Paberalius, kicked them while they were laying on the ground. (*Id.*) Neither of the suspects was seriously injured. (Am. Compl. Ex. E) (stating that each suffered only "slight health impairment").

---

[6] Paberalius's version of events was corroborated by at least two other witnesses. (Battery Summary 2.)

[7] While the translated Battery Summary uses the term "testify," it is not clear whether the suspects testified at a hearing, made statements under oath, or were merely interviewed by authorities.

On February 4, 2010, over 11 years after the incident, the District Prosecutor's Office of Kėdainiai Region formally recognized Paberalius as a suspect for violation of the public order. (Am. Compl. Ex. E.) Thereafter, on March 2, 2010, Paberalius was formally charged with violating paragraph 1 of article 284 of the Criminal Code of the Republic of Lithuania, which provides that:

> Any person who, by rude acts, threats, degrading treatment or acts of vandalism, demonstrates disrespect to the surrounding people or the environment and disrupts public peace or order in a public place, shall be punished by community service, or a fine, or restriction of liberty, or detention, or imprisonment up to two years.

(*Id.* Exs. F; Battery Summary.) A warrant was then issued for Paberalius's arrest. (Am. Compl. Ex. F.)

## III. DISCUSSION

### A. Preliminary Findings

#### 1. Authority of the Judicial Officer

The extradition statute authorizes federal magistrate judges to hear and decide extradition requests if "authorized . . . by a court of the United States." 18 U.S.C. § 3184; *Nolan*, 651 F. Supp. 2d at 792; *see also Austin v. Healey*, 5 F.3d 598, 601–02 (2d Cir. 1993) (rejecting challenge to magistrate judge's authority to conduct an extradition hearing without specific delegation of authority for that particular case). Paberalius does not contest this Court's authority to hear and decide the request for extradition. (Opp'n 1–2.) The Court has the requisite subject matter jurisdiction over this extradition proceeding. *See Nolan*, 651 F. Supp. 2d at 792.

### 2. *Jurisdiction Over the Fugitive*

The extradition statute provides for this Court's jurisdiction over any person "found within [t]his jurisdiction." 18 U.S.C. § 3184. Paberalius was arrested within the jurisdiction of the Northern District of Illinois. (Reply 11.) Moreover, Paberalius does not contest this Court's jurisdiction over him. (Opp'n 1–2.) Accordingly, this Court has the requisite personal jurisdiction to determine the extraditability of Paberalius pursuant to 18 U.S.C. § 3184. *See In re Rodriguez Ortiz*, 444 F. Supp. 2d at 882.

### 3. *Identity of the Fugitive*

Paberalius does not dispute that he is the individual identified in the extradition request. (Opp'n 1–2.) The Court finds that Paberalius is the person named in the extradition request and supporting documents proffered by Lithuania.

### 4. *Existence of an Extradition Treaty*

Extradition is proper where there is a treaty or convention for extradition in force between the requesting country and the United States. 18 U.S.C. §§ 3181, 3184; *see also In re Kam-Shu*, 477 F.2d 333, 339 n.9 (5th Cir. 1973) ("Extradition treaties should be construed liberally, but absent a treaty or specific authority in a treaty the United States generally will not extradite a fugitive."). The United States has submitted the declarations of Patricia McDonough and Virginia Prugh, each an Attorney-Advisor in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and Lithuania. (Reply Exs. C, D.) Paberalius has not challenged the validity or applica-

tion of the Treaty (Opp'n 1–2), and the Court has no reason to suspect its legitimacy. Accordingly, the Court finds that there is a valid extradition treaty in full force and effect between the United States and Lithuania.

## B. Dual Criminality

Next, the Court must determine if either of the two offenses provides a basis for Paberalius's extradition. The Treaty allows for extradition of "persons whom the authorities in the Requesting State have charged with or convicted of an extraditable offense." (Treaty art. 1). The Treaty defines an offense as "extraditable" if it is "punishable under the laws of both [the United States and Lithuania] by deprivation of liberty for a period of more than one year or by a more severe penalty." (*Id.* art. 2, ¶ 1.) In other words, to be extraditable, the conduct must qualify as a felony in the United States. Here, Lithuania requests Paberalius's extradition for: (1) violation of the Road Traffic Regulations or rules of exploitation of the means of transport causing death of a person, in violation of paragraph 4 of article 246 of the Criminal Code of the Republic of Lithuania; and (2) Violation of Public Order, in violation of paragraph 1 of article 284 of the Criminal Code of the Republic of Lithuania. (Am. Compl. ¶¶ 5, 8 & Exs. C, F, G.)

### 1. Applicable Law

"To determine if so-called 'dual criminality' exists, the court examines the *description of criminal conduct* provided by [the requesting state] in support of its charge and then decides whether that co*nduct would have been criminal under United States law* if committed in this country. [The requesting state] is not obliged

to produce evidence on all elements of a criminal offense nor to establish that its crimes are identical to those in the United States. Dual criminality is established if the conduct involved in the foreign offense would be criminal under either United States federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states." *In re Swierzbinski*, 2010 WL 750240, at \*2 (D. Kan.) (emphasis added), *habeas corpus dismissed by Swierzbinksi v. Holder*, 2010 WL 2484216 (D. Kan. 2010), *aff'd*, 408 F. App'x 188 (10th Cir.), *petition for cert. filed*, No. 10-10280 (U.S. Apr. 28, 2011). "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see In re Rodriguez Ortiz*, 444 F. Supp. 2d at 883 ("The Court will not simply look for common names, but will assess what charges would be forthcoming had the facts alleged occurred within a domestic jurisdiction."); *Messina v. United States*, 728 F.2d 77, 79 (2d Cir. 1984) ("The requirement of the Treaty is met if the particular acts charged are criminal in both jurisdictions, regardless of whether the crimes bear the same names.").

## 2. *Traffic Violation*

As to the traffic violation, Lithuania seeks Paberalius's extradition to serve his three-year sentence for violating the terms of his supervised release, following his conviction for violating certain traffic regulations resulting in death. (Am. Compl. ¶ 5.) As a preliminary matter, Paberalius contends that the extradition request re-

garding the traffic incident is based on a nonextraditable violation of a condition of release, not the conduct of the traffic violation itself. (Opp'n 6–9; Hr'g Tr. 13–15, 91–95.) The Court disagrees.

In the United States, "a suspended sentence is a prison term imposed for the offense of conviction. Once the prison term is triggered, the defendant is incarcerated not for the probation violation, but for the underlying offense." *Alabama v. Shelton*, 535 U.S. 654, 662 (2002); *see Johnson v. United States*, 529 U.S. 694, 701 (2000) ("We . . . attribute postrevocation penalties to the original conviction."); *United States v. Dozier*, 555 F.3d 1136, 1140 (10th Cir. 2009) ("Incarceration resulting from a probation revocation is punishment for the original offense."). Thus, in an extradition case similar to Paberalius's, the District of Kansas concluded that "the June 12, 1995 revocation of [the relator's] probation is punishment for his extraditable 1993 crimes and not a separate offense for which [the requesting state] seeks extradition." *In re Swierzbinski*, 2010 WL 750240, at *4; *cf. United States v. Clark*, 470 F. Supp. 976, 978 (D. Vt. 1979) ("Respondent's argument that his offense is not comprehended by the [United States/Canada Extradition] Treaty because he was sentenced to a term of less than a year is without merit. Article 2, § 1 of the Treaty explicitly refers to offenses 'punishable . . . by a term of imprisonment exceeding one year,' and the offense is punishable by terms far longer than that in both countries. Leniency in sentencing does not raise a bar to extradition."). Similarly, the Ninth Circuit found "no basis for [the relator's] argument that revocation of probation is a 'charged' but 'unconvicted'—and therefore 'new' or 'separate'—offense for which he

may not be extradited, or that probation revocation is somehow a non-extraditable 'summary conviction offense.' Parole and probation are part of the original sentence, and revocation of parole or probation is regarded as reinstatement of the sentence for the underlying crime, not as punishment for the conduct leading to the revocation." *United States v. Lazerman*, 1999 WL 542876, at *2 (9th Cir. 1999) (citation omitted) (unpublished opinion).

Here, the Lithuanian court sentenced Paberalius to imprisonment for a term of three years for violating certain traffic regulations causing death of a person. (Am. Compl. ¶ 5.) The court, however, suspended the sentence for a two-year period provided that Paberalius notify the court of any change of address and pay compensation for the damage caused by the crime. (*Id.*) Thereafter, the court revoked Paberalius's suspended sentence after he changed his place of residence without notice, and ordered him to serve the custodial sentence. (*Id.*) The revocation of Paberalius's suspended sentence is not a new, separate offense for which Lithuania seeks extradition. Consequently, Paberalius is being extradited to serve his reinstated sentence for his traffic conviction, and not merely for violating the terms of his supervised release. Accordingly, the Court will apply its dual criminality analysis to the 1998 traffic violation.

The Government contends that Paberalius's conduct would make him liable in the United States for aggravated reckless driving. Under Illinois law, aggravated reckless driving is punishable as a Class 4 felony. 625 ILCS § 5/11-503(c); *see* 730 ILCS § 5/5-4.5-45(a) (The sentence for a Class 4 felony is not less than one year and

not more than 3 years.); *see also In re Swierzbinski*, 2010 WL 750240, at *2 ("Dual criminality is established if the conduct involved in the foreign offense would be criminal under either United States federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states."). A person commits aggravated reckless driving if he "drives any vehicle with a willful or wanton disregard for the safety of persons or property" that "results in great bodily harm or permanent disability or disfigurement to another." 625 ILCS § 5/11-503(a), (c).

The Government argues that because Paberalius has already been convicted of violating the Lithuanian statute, this Court's review is very limited. (Reply 17–19; Hr'g Tr. 9, 75–79, 105.) Specifically, the Government contends that Paberalius's conviction is *per se* evidence of probable cause. (*Id.*) Accordingly, the Government asserts that the "Court's inquiry should stop there." (Hr'g Tr. 9.)

The Treaty distinguishes between individuals "sought for prosecution" and "a person who has been convicted." *Compare* Treaty art. 8 ¶ 3, *with id.* ¶ 4. Although the Treaty requires "such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought" for a person who faces charges upon extradition, *id.* ¶ 3(c), no such information is required when the person has already been convicted. Courts are in agreement. "A foreign conviction obtained after a trial at which the accused is present is sufficient to support a finding of probable cause for the purposes of extradition." *Sidali v. INS*, 107 F.3d 191, 196 (3d Cir. 1997); *see Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) ("Spatola's 1983 convictions [in Italy] were obtained following a trial at

which Spatola was present and represented by counsel. To hold that such convictions do not constitute probable cause in the United States would require United States judicial officers to review trial records and, consequently, substitute their judgment for that of foreign judges and juries. Such an inquiry would be inconsistent with principles of comity."); *In re Swierzbinski*, 2010 WL 750240, at *4 ("When there has been a judgment of conviction entered by a foreign court, as there is here, the court may deem probable cause established."). Thus, because Paberalius was convicted in Lithuania of the traffic offense, the Court could deem probable cause established.

However, even if probable cause is presumed, the Court must still determine whether dual criminality exists. Just because a Lithuanian court has found that Paberalius violated a Lithuanian felony statute does not provide *per se* evidence that Paberalius's conduct would be a felony in Illinois. *See In re Swierzbinski*, 2010 WL 750240, at *2 ("To determine if so-called 'dual criminality' exists, the court examines the *description of criminal conduct* provided by [the requesting state] in support of its charge and then decides whether that co*nduct would have been criminal under United States law* if committed in this country.") (emphasis added); *In re Rodriguez Ortiz*, 444 F. Supp. 2d at 883 ("The Court . . . will assess what charges would be forthcoming had the facts alleged occurred within a domestic jurisdiction."). Here, the Court finds that the description of criminal conduct provided by Lithuania falls short of establishing that Paberalius's conduct would be a felony in Illinois.

First, Illinois law includes a more stringent *mens rea* requirement than does Lithuania law. Lithuania found that Paberalius illegally used the center lane to pass the bus before coming to an abrupt stop. (Judgment 1–2, 5–6.) In Lithuania, a mere violation of a traffic regulation which causes death is a felony. (Reply Ex. E at 2.) In Illinois, by contrast, illegal lane usage is a petty offense, *see* 625 ILCS § 5/11-709(a), and does not by itself constitute willful or wanton conduct. In fact, "criminal liability does not attach to every act of negligence resulting in injury, or even death, to another person, but only to negligence of such a reckless or wanton characteristic to show an utter disregard for the safety of others under circumstances likely to cause injury." *People v. LaCombe*, 432 N.E.2d 672, 676 (Ill. App. Ct. 1982). Thus, aggravated reckless driving requires more than just a traffic violation which results in great bodily harm or death. Instead, reckless driving is a felony only if there is evidence of willful or wanton conduct. 625 ILCS § 5/122-503(a).

Second, there is no evidence that Paberalius acted willfully. "A person acts knowingly with regard the result of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct. Conduct performed knowingly or with knowledge is performed willfully." Illinois Pattern Jury Instructions—Criminal ("IPICRIM") § 5.01B (4th ed. 2000). The Lithuania court acknowledged that Paberalius did not act with intent to harm the bus passenger. (Judgment 8.) In fact, Lithuania has not provided any evidence that Paberalius was *consciously aware* that his actions were *practically certain* to cause great bodily harm to a bus

passenger. Accordingly, there is no evidence that Paberalius acted with willful disregard for the safety of the bus passenger.

Third, there is no evidence that Paberalius acted recklessly. "A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly." IPICRIM") § 5.01. Lithuania has not provided any evidence that Paberalius *consciously disregarded* a *substantial and unjustifiable risk* that his actions would cause the bus passenger to suffer a great bodily injury, or that Paberalius's actions were a *gross deviation* from the standard of care a reasonable person would have exercised in the situation. *See* IPICRIM § 5.01. In fact, there are no indicia that Paberalius was driving in a reckless manner. As discussed above, illegal lane usage is a petty offense and does not by itself constitute willful or wanton conduct. The weather was clear. (Hr'g Tr. 38–39.) There was no evidence of road rage or alcohol usage. Paberalius was not speeding. On the contrary, he was driving at a pedestrian 25 mph, only a few miles per hour faster than the bus. (Judgment 1, 2.) After avoiding the car that suddenly pulled in front of him out of the side street, Paberalius moved back into the right lane and momentarily stopped before proceeding forward.[8] (*Id.* 1–3, 6; Hr'g Tr. 39–

---

[8] While Paberalius cannot offer contradictory evidence at an extradition hearing, *see In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884, the evidence provided by Lithuania does not exclude the car pulling out in front of Paberalius's vehicle. Indeed, the bus driver conceded that he was not paying attention to whether a car had pulled out from the side street. (Judgment 3.)

40.) There were no skid marks. (Judgment 6.) In sum, there is no evidence that Pa-beralius acted with wanton disregard for the safety of the bus passenger.

In similar factual scenarios, Illinois courts have not found aggravated reckless driving. For example, in *Canning v. Barton*, 637 N.E.2d 702 (Ill. App. Ct. 1994), plaintiffs were injured after their car struck a garbage truck stopped in a traffic lane. *Id.* at 705. The court found, as a matter of law, that the garbage truck driver did not act "willfully and wantonly" by stopping the garbage truck in a "no parking" zone on a busy road during rush hour while performing residential garbage pickup. *Id.* "The evidence presented by plaintiffs did not suggest, for instance, that defendants knew of any impending danger resulting from their conduct, or that defendants could have discovered any impending danger through the exercise of ordinary care." *Id.* Here, there is no evidence that Paberalius knew of or could have reasonably discovered a substantial and unjustifiable risk from stopping in front of the bus.

Similarly, in *Larson v. Fell*, 204 N.E.2d 475 (Ill. App. Ct. 1965), a motorist struck a pedestrian in a crosswalk. *Id.* at 476. The court found, as a matter of law, that "this case lacks these attributes of wantonness and wilfulness." *Id.* at 479. "The evidence when construed in its aspects most favorable to plaintiff, together with all reasonable inferences arising therefrom, fails to prove a consciousness on the part of the defendant that his conduct would naturally and probably result in injury to another; and, it was not the type conduct which exhibited a conscious indifference to consequences and constituted constructive or legal wilfulness. It was more in the nature of momentary lapse from that degree of attentiveness required by due care."

*Id.* Here, while Paberalius's conduct may be negligent, there is no evidence to demonstrate a consciousness or conscious indifference on his part required to prove recklessness.

Nevertheless, the Government contends that Paberalius's conduct falls within the ambit of aggravated reckless driving. (*See* Reply 13–15.) The case cited by the Government, however, is easily distinguished. In *People v. Brady*, 318 N.E.2d 642, 643 (Ill. App. Ct. 1974), defendant was convicted of reckless driving after he was observed driving at 50 mph in a residential area and crossing from one side of the road to the other. Here, in contrast, Paberalius was traveling at 25 mph and did not cross over into opposing traffic.[9]

Finally, the Government argues that Paberalius was reckless because at the time of the incident, he was not paying attention to what was going on behind him and did not see the bus. (Hr'g Tr. 77.) The Court disagrees. Just because Paberalius does not recall seeing the bus—over 13 years later—does not mean that he was unaware of it at the time. Paberalius testified that his attention was focused on the vehicle that suddenly appeared from the side street, cutting him off. (*Id.* 59–60.) The Court finds Paberalius's testimony credible—it was clearly reasonable for Paberalius to be focused on the hazard in front of him until the car from the side street had cleared Paberalius's path. Further, simply not noticing the bus cannot be con-

---

[9] The Government also cites *People v. Wallace*, 256 N.E.2d 356 (Ill. App. Ct. 1970), for the proposition that "testimony as to motorist's speed and crossing of center line, and with respect to nature of the road and terrain, was sufficient to contain conviction for reckless driving." (Reply 14.) However, as the Government noted, only the abstract of the case is available, which provides no factual detail in support of the headnote cited by the Government.

sidered a gross deviation from a reasonable standard of care and, thus, is not reckless conduct.

The Court also notes that while the bus driver's conduct is not at issue, his actions may have been ultimately responsible for the incident. If the bus driver was keeping a proper lookout, he would have noticed Paberalius's vehicle overtaking him on the left. *See Henning v. State*, 46 Ill. Ct. Cl. 199, 1993 WL 810983, at *1 (1993) ("A driver's duty of reasonable care includes keeping a proper lookout and keeping his vehicle under control so as to avoid collisions. In addition a driver is required to maintain reasonable speed so that his vehicle may be safely stopped within the distance that objects may be seen ahead."). Under these circumstances, the bus driver should have slowed, anticipating that Paberalius would return to the right lane. *See Gildehaus v. State*, 46 Ill. Ct. Cl. 176, 1993 WL 810920, at *4 (1993) ("It is the driver approaching another from the rear who has the duty to maintain a safe lookout and it is he who must consider the possibility of having to stop suddenly.").

### 3. *Disturbing the Peace*

Lithuania also seeks Paberalius's extradition to stand trial on charges that he violated public order. (Am. Compl. ¶ 8.) Lithuania contends that while working as a security guard at a café, Paberalius and two of his colleagues beat two persons who were suspects in an earlier battery. (Battery Summary 1.) According to Lithuania's summary of the evidence, the security guards "clenched" the two suspects and took

them to a warehouse where the battery occurred. (*Id.* 1–2.) Neither of the suspects was seriously injured. (Am. Compl. Ex. E.)

The Government contends that Paberalius's alleged conduct would make him liable for aggravated battery. (Reply 15–16.) In Illinois, "a person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS § 5/12-3(a). Battery is a Class A misdemeanor. *Id.* § 5/12-3(b). A simple battery may be elevated to an aggravated battery, a Class 3 felony, when committed under one or more circumstances. *Id.* § 5/12-4. For example, a person committing a battery may be found guilty of aggravated battery if he or she "intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement," or if the battery occurs "on or about a public way, public property or public place of accommodation or amusement." *Id.* § 5/12-4(a), (b)(8).

Here, the Government acknowledges that the suspects did not receive serious injuries; instead, the Government's only theory elevating the simple battery to aggravated battery is that the conduct occurred in a public place of accommodation. (Reply 15–16; Hr'g Tr. 81–82.) Specifically, the Government contends that the battery began in the café when Paberalius and the two other security guards physically apprehended the suspects, "dragged them out of the café and into the warehouse of an adjacent shop where the battery continued." (Reply 16.) However, the evidence provided by Lithuania, including testimony by the alleged victims, states that the bat-

tery took place in the warehouse. (Battery Summary 1–2.) There is no evidence that the warehouse was an area open to the public. *See People v. Ward*, 419 N.E.2d 1240, 1244 (Ill. App. Ct. 1981) ("Whether the property was actually publicly owned and, therefore, 'public property' rather than a privately owned 'public place of accommodation' is irrelevant; what is significant is that the alleged offense occurred in an area accessible to the public."). Indeed, the Government concedes that the warehouse was not in a public area. (Reply 23.) Thus, given that the suspects suffered only "slight" injuries and the alleged battery occurred in a nonpublic place, the Court finds that the description of criminal conduct provided by Lithuania falls short of establishing that Paberalius's conduct would be a felony in Illinois.

## C. Probable Cause

Even assuming that the description of criminal conduct provided by Lithuania was sufficient to indicate that an aggravated battery occurred, the Court finds no competent legal evidence to support a finding of probable cause as to this charge.

### 1. Applicable Law

This Court is not required to determine if Paberalius is guilty of aggravated battery "but merely whether there [i]s competent legal evidence which would justify his apprehension and commitment for trial if the crime had been committed in Illinois." *In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884 (citing *Collins*, 259 U.S. at 314–15); see also *Gill v. Imundi*, 747 F. Supp. 1028, 1038 (S.D.N.Y. 1990) ("The hearing before the extradition magistrate does not determine the guilt or innocence of the accused but rather represents a judgment whether there is competent evidence that

would support a reasonable belief that the subject of the proceedings was guilty of the crimes charged.") (citations omitted). Competent evidence for purposes of an extradition proceeding "is not necessarily evidence competent to convict." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *accord Esposito v. Adams*, 700 F. Supp. 1470, 1476 (N.D. Ill. 1988) *see Collins*, 259 U.S. at 317 (Extradition may be predicated entirely on the "unsworn statements of absent witnesses.").

The probable cause standard is a "flexible, practical common-sense one." *United States v. Hayes*, 236 F.3d 891, 894 (7th Cir. 2001). Probable cause will be found where there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused. *In re Guillen*, 1991 WL 149623, *8, (N.D. Ill. July 12, 1991). "In making this determination, courts apply a 'totality of the circumstances analysis' and 'make a practical, common sense decision whether, given all the circumstances . . ., there is a fair probability' that the defendant committed the crime." *In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (internal citations omitted).

However, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure do not apply to extradition proceedings. *Bovio*, 989 F.2d at 259 n.3. Thus, hearsay evidence may be considered and may form the basis for a finding of probable cause. *Collins*, 259 U.S. at 317. Nevertheless, the evidence offered in support of extradition must be "competent and adequate." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). Accordingly, when "presented with evidence through affidavits, the

court may conclude, on a review of the affidavits submitted that there are insufficient indicia of reliability or credibility to establish probable cause." *In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884 (citations omitted). Similarly, when an extradition request consists of "mere conclusory allegations unsupported by substantive evidence, extradition will be denied." *Id.* (citation omitted).

### 2. Analysis

The Government argues that the battery began inside the café when the two suspects were physically apprehended by Paberalius and his two colleagues. (Reply 23.) The Government's argument fails on two grounds.

First, there is no competent evidence that Paberalius or his colleagues made any "physical contact of an insulting or provoking nature," 720 ILCS § 5/12-3(a), in the café. Neither the suspects nor other witnesses testified that the guards forcibly removed them from the café. (Battery Summary 1–2.) Indeed, Paberalius credibly explained that when he and his colleagues approached the suspects, they agreed to voluntarily accompany the security guards to the warehouse.[10] (Hr'g Tr. 48.) Because the suspects volunteered to leave the café with the security guards, the guards' slight touching, which was described by the suspects and other witnesses as "clenching" or "taking," does not constitute insulting or provoking contact. Thus, the Court finds no competent evidence that the battery began in the café.

---

[10] The evidence provided by Lithuania does not state whether the suspects left the café voluntarily. Thus, Paberalius's testimony does not contradict the evidence proffered by Lithuania; instead Paberalius's testimony merely explains Lithuania's proof. *See In re Rodriguez Ortiz*, 444 F. Supp. 2d at 884.

Even assuming that the battery began in the café, the Court does not find prob-able cause that, on the night in question, the café was a public place of accommoda-tion. Illinois is apparently unique in believing that "a battery committed in an area open to the public, whether it be a public way, public property or public place of ac-commodation or amusement, constitutes a more serious threat to the community than a battery committed elsewhere."[11] *Ward*, 419 N.E.2d at 1244. Further, "the legislative intent of the statute is clear: it intended to protect the public safety by making more serious a battery done in a public place, because it constitutes a more serious threat to the community than simple battery." *People v. Buie*, 577 N.E.2d 941, 943 (Ill. App. Ct. 1991) (citation omitted). Thus, a simple battery is elevated to a felony under the public accommodation exception only where it occurs in "places where the public is invited to come into and partake of whatever is being offered therein." *People v. Murphy*, 496 N.E.2d 12, 14 (Ill. App. Ct. 1986); *see Ward*, 419 N.E.2d at 1244 ("what is significant is that the alleged offense occurred in an area accessible to the public").

Here, Paberalius credibly testified that on the night of the incident, the Vikonda café was hosting a *private* party.[12] (Hr'g Tr. 47.) Thus, the alleged battery did not occur in "an area accessible to the public," *Ward*, 419 N.E.2d at 1244, or in a place "where the public is invited to come into and partake of whatever is being offered therein," *Murphy*, 496 N.E.2d at 14. Accordingly, the Court finds that the alleged battery was not of the sort that is committed in a public place and which the Illinois

---

[11] The Court cannot locate a similar statute in any United States jurisdiction.

[12] Lithuania's evidence did not state whether the café was public or private.

legislature found "constitutes a more serious threat to the community that a battery committed elsewhere." *Ward*, 419 N.E.2d at 1244.

In sum, given the totality of the circumstances, the Court cannot find competent evidence that a battery was committed in a public place. Accordingly, the Court does not find probable cause that Paberalius committed aggravated battery.

## IV. CONCLUSION

For the reasons set forth above, and upon consideration of the entire record, the Court finds that the Government has failed to meet its burden under the Extradition Treaty between the United States and the Republic of Lithuania and under the federal extradition statutes. The Government's evidence falls short of establishing that the crimes for which extradition are requested would be felonies in the United States or establishing probable cause to believe that an aggravated battery occurred.

Accordingly, the Court **DENIES** the request for extradition with regard to Sarunas Paberalius. It is further **ORDERED** that Sarunas Paberalius be released from custody forthwith. Paberalius's Motion for Bond [31] is **DENIED** as moot.

E N T E R:

Dated: May 31, 2011

_____

NAN R. NOLAN
United States Magistrate Judge